# EXHIBIT A

THOMAS M. BIESTY
NY Bar No. 4172896; (202) 326-3043; tbiesty@ftc.gov
LAURA C. BASFORD
DC Bar No. 993645; (202) 326-2343; lbasford@ftc.gov
J. RONALD BROOKE, JR.
MD Bar No. 0202280002; (202) 326-3484; jbrooke@ftc.gov
JOSHUA A. DOAN
DC Bar No. 490879; (202) 326-3187; jdoan@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., NW, CC-6316
Washington, DC 20580

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

AARON D. FORD
Attorney General
ERNEST D. FIGUEROA
Consumer Advocate
LUCAS J. TUCKER
NV Bar No. 10252; (702) 486-3256; ltucker@ag.nv.gov
SAMANTHA B. FEELEY
NV Bar No. 14034; (702) 486-3789; sfeeley@ag.nv.gov
State of Nevada, Office of the Attorney General
Bureau of Consumer Protection
8945 W. Russell Road, #204
Las Vegas, NV 89148

Attorneys for Plaintiff
STATE OF NEVADA

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and<br><br>STATE OF NEVADA,<br><br>     Plaintiffs,<br><br>     v. | Case No. _____<br><br>**[REDACTED]**<br>**COMPLAINT FOR PERMANENT**<br>**INJUNCTION, MONETARY**<br>**JUDGMENT, AND OTHER**<br>**RELIEF** |

1

1    INTERNATIONAL MARKETS LIVE, INC., a
2    corporation, also d/b/a IYOVIA, iMarketsLive,
     IM Mastery Academy, and IM Academy,
3
4    IM MASTERY ACADEMY LTD., f/k/a
     International Markets Live Ltd., a United
5    Kingdom company,

6    ASSIDUOUS, INC., a corporation,
7
     GLOBAL DYNASTY NETWORK, LLC., a
8    limited liability company,

9    CHRISTOPHER TERRY, individually and as an
10   owner and officer of INTERNATIONAL
     MARKETS LIVE, INC.,
11
12   ISIS TERRY, fka ISIS DE LA TORRE,
     individually and as an owner and officer of
13   INTERNATIONAL MARKETS LIVE, INC., IM
     MASTERY ACADEMY LTD., and
14   ASSIDUOUS, INC.,

15
     JASON BROWN, individually and as an officer
16   of INTERNATIONAL MARKETS LIVE, INC.
     and as a member of GLOBAL DYNASTY
17   NETWORK, LLC,

18
     ALEX MORTON, individually and as an officer
19   of INTERNATIONAL MARKETS LIVE, INC.,

20
     MATTHEW ROSA, individually and as a member
21   of GLOBAL DYNASTY NETWORK, LLC; and

22   BRANDON BOYD,
23
         Defendants.
24

25          Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"), and the

26   State of Nevada, by and through its counsel and Attorney General, for their Complaint allege:

27
28                                         2

1. The FTC brings this action under Sections 5(a), 13(b), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 53(b), and 57b, the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, and under Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404. These statutes authorize the FTC to seek, and the Court to order, temporary, preliminary, and permanent injunctive relief, monetary relief, and other relief against Defendants for engaging in acts or practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the FTC's Telemarketing Sales Rule ("TSR" or "Rule"), 16 C.F.R. Part 310, and Section 4 of ROSCA, 15 U.S.C. § 8403.

2. The State of Nevada, by and through the Office of the Attorney General, Aaron D. Ford, and Consumer Advocate, Ernest D. Figueroa, Senior Deputy Attorney General Lucas J. Tucker, and Senior Deputy Attorney General Samantha B. Feeley, brings this action pursuant to the Deceptive Trade provisions of Chapter 598 of the Nevada Revised Statutes, to secure preliminary and permanent injunctive relief, restitution, and other appropriate relief.

## SUMMARY OF THE CASE

3. Since at least 2018, Defendants have operated a large deceptive investment training scheme targeting young adults, including Black and Latino consumers. Since 2019, the scheme has operated under the name "IM Mastery Academy," and is also known as "IML," and "IM Academy." In November 2024, the Defendants rebranded their scheme under the name "IYOVIA," but the services offered and marketing methods remain fundamentally the same.

4. Defendants represent that IML instructors will teach consumers how to make significant income trading in the foreign exchange, binary options, cryptocurrency, and stock markets (IML's "Trading Training Services"). IML refers to its trading instructors as "educators;" this Complaint refers to those individuals as "instructors."

3

5. Defendants also represent that consumers can make significant income by joining IML as salespeople and receiving commissions for selling IML's Trading Training Services, and by recruiting other consumers to join IML as salespeople (the "Business Venture").

6. Defendants' marketing, deployed through a global multi-level marketing network, routinely features examples of supposed profitable trades, images and videos of luxurious and expensive lifestyles purportedly funded by trading profits and IML commissions, statements about gaining financial freedom, and other similar claims conveying the impression that purchasers of the Trading Training Services and the Business Venture are likely to make significant income. Defendants make their deceptive earnings claims online, through social media platforms, through telemarketing, and at live events.

7. Defendants, however, lack support for their lavish, and often made up or false, earnings representations. In truth, a substantial percentage of purchasers of the Trading Training Services lose money trading, on top of the hefty sum they pay IML. Furthermore, many of IML's instructors are not successful traders. And Defendants' own data show that the vast majority of IML salespeople lose money or make negligible income.

8. Defendants profit handsomely from the deceptive earnings claims of their salespeople, which have generated more than $1.242 billion in worldwide sales since 2018. Instead of disciplining or terminating high-earning salespeople when confronted with evidence of their deceptive earnings claims, IML and IML CEO Christopher "Chris" Terry often reward them with lucrative payouts. Defendants IML, Alex Morton, Jason Brown, and Matthew "Matt" Rosa have even instructed IML's salespeople on how to make those claims while escaping the detection of IML's compliance program and law enforcement.

9. Defendants' scheme has drawn the attention of numerous U.S. and foreign government agencies. No fewer than 21 international government agencies have issued warnings

about the scheme, and Canadian law enforcement has taken legal action against IML.

10.    Defendants' deceptive practices have violated, and are violating, the FTC Act, the TSR, ROSCA, and the Nevada Deceptive Trade Practices Act, as described herein.

11.    On October 26, 2021 the FTC sent Defendant IML the Synopses Concerning Money-Making Opportunities and Testimonials and Endorsements (both then titled "Notice of Penalty Offenses"), and on December 9, 2022 the FTC sent Defendants Alex Morton and Matthew Rosa the Synopsis Concerning Money-Making Opportunities (then titled "Notice of Penalty Offenses") (collectively the "Synopses"), noting that they could be subject to civil penalties for violations of the FTC Act in connection with their marketing claims, pursuant to 15 U.S.C. § 45(m)(1)(B); 16 C.F.R. § 1.98(e). The Synopses stated that it is an unfair or deceptive trade practice to make false, misleading, or deceptive representations concerning the profits or earnings a participant in a money-making opportunity can expect or to engage in certain acts or practices related to consumer testimonials. Defendants IML, Morton and Rosa, however, have continued to use deceptive or unsubstantiated earnings claims in their marketing even after receiving the Synopses.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355 with respect to the federal law claims, and pursuant to 28 U.S.C. § 1367 with respect to the supplemental state law claims of the State of Nevada.

13.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(1), (c)(2), and (c)(3), 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFFS

14.    The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15

5

U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces ROSCA, 15 U.S.C. §§ 8401 *et seq.*, which prohibits certain methods of negative option marketing on the internet, and the Telemarketing Act. In accordance with the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

15.     Plaintiff State of Nevada is one of the 50 sovereign states of the United States. Attorney General Aaron D. Ford is the chief law enforcement officer of the State of Nevada, and his appointed Consumer Advocate, Ernest D. Figueroa, is vested with the authority to enforce Nev. Rev. Stat. §§ 598.0903, *et seq*. ("Nevada Deceptive Trade Practices Act" or "DTPA"). The Attorney General, by and through the Consumer Advocate and his undersigned counsel, brings this action pursuant to Nev. Rev. Stat. §§ 228.380 and 598.0963(3).

## DEFENDANTS

16.     Defendant International Markets Live, Inc. ("IML" or "the Company"), also doing business as iMarketsLive, IM Mastery Academy, IM Academy, and IYOVIA, is a New York corporation with places of business at 3750 South Las Vegas Blvd., Las Vegas, Nevada, 89109 and 2900 W Horizon Ridge Pkwy STE 200, Henderson, Nevada 89052. IML also has used 108 Village Square, Somers, New York, 10589 as a mailing address. Since 2021, IML has been registered as a foreign corporation doing business in Nevada. IML transacts or has transacted business in this District and throughout the United States. Defendant Chris Terry and his wife Isis Terry co-own IML, and Defendants Jason Brown and Alex Morton are officers of IML. Defendants Rosa and Boyd are IML salespeople who have earned millions hawking IML's Trading Training Services and the Business Venture. At all times relevant to this Complaint, acting alone or in concert with others, IML has advertised, marketed, distributed, or sold Trading

6

Training Services and the Business Venture to consumers in this District and throughout the United States. Many of IML's customers and salespeople are Nevada residents.

17.     Defendant IM Mastery Academy Ltd. ("IML UK"), formerly known as International Markets Live, Ltd., is a United Kingdom company with its registered address at Floor 11, Two Snow Hill, Queensway, Birmingham, England, B4 6WR. IML UK has also used 108 Village Square, Somers, New York, 10589 as a mailing address. IML UK transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, Defendant Isis Terry has been the sole officer and shareholder of IML UK. IML has stated that IML UK is an affiliate of IML. IML UK opened merchant accounts to process and receive consumers' credit card payments, including payments from U.S. consumers, to IML. IML UK has commingled funds with IML.

18.     Defendant Assiduous, Inc. ("Assiduous") is a Delaware corporation that, at times material to this complaint, has maintained a principal place of business at 2450 St. Rose Parkway, Suite 120, Henderson, Nevada 89074. Assiduous has also used 108 Village Square, Somers, New York, 10589 as a mailing address. IML has stated that Assiduous is an affiliate of IML. Assiduous transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, Defendant Isis Terry has been the sole officer and shareholder of Assiduous. Assiduous accepts consumers' cryptocurrency payments to IML on IML's behalf, and IML paid service fees to open a cryptocurrency payment account for Assiduous. IML employees have negotiated with a cryptocurrency payment processor on behalf of Assiduous. As part of that negotiation, an IML employee represented that Assiduous was registered in Nevada as a foreign corporation doing business in the state. IML employees have also worked with the cryptocurrency payment processor to process refunds to unsatisfied IML consumers who paid for IML services with cryptocurrency. An IML employee has acted as

7

"office manager" for Assiduous, and Assiduous has commingled funds with IML. Assiduous also holds the lease for a property IML uses in Utah.

19.     Defendant Global Dynasty Network, LLC ("GDN") is a Nevada limited liability company that, at times material to this complaint, has maintained a principal place of business at 2450 St. Rose Parkway, Suite 120, Henderson, Nevada 89074. GDN transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, Defendants Jason Brown and Matt Rosa have been the sole members and employees of GDN. GDN is the corporate entity that Brown and Rosa use to participate in the IML Business Venture and to accept payments from IML for amounts Rosa and Brown earned as IML salespeople. GDN has received over $33 million from IML.

20.     Defendant Christopher Terry, also known as Chris Terry, is the Chief Executive Officer ("CEO") and co-owner of IML. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices described in this Complaint. Chris Terry has signatory authority on bank accounts in the name of IML. He directed IML employees to open a bank account in the name of Assiduous. As CEO, Chris Terry has ultimate decision-making authority over all of IML's business operations, including the Business Venture and its Trading Training Services, and he makes final decisions about the oversight and discipline of IML's salespeople. In addition to making deceptive earnings claims himself, he has repeatedly allowed top salespeople to make deceptive earnings claims and has authorized large monetary bonuses for such salespeople despite knowledge of the deceptive claims they made. Chris Terry has communicated with payment processors about IML's high credit card chargeback rates and is aware of multiple U.S. and foreign law enforcement actions against IML. He knew that Matthew Thayer, one of IML's most popular instructors, posted fake trading results and profited by

8

referring consumers to unregulated offshore brokers. He is also aware that other IML officers have advised IML salespeople on ways to evade IML's compliance program and law enforcement. Chris Terry is aware of numerous consumer complaints about IML, the Trading Training Services, and the Business Venture. Together with his wife, Defendant Isis Terry, Chris Terry has received at least $20 million from Defendants' scheme. He resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

21.    Defendant Isis Terry, also known as Isis De La Torre, is the Chief Financial Officer ("CFO") and co-owner of IML, the sole owner and officer of IML UK, and sole owner and officer of Assiduous, Inc. At all times relevant to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices described in this Complaint. As IML's CFO, Isis Terry manages all financial operations of IML, including managing IML's relationships with banks and payment processors. She has signed payment processing agreements on behalf of IML and has signatory authority on bank accounts in the name of IML and Assiduous. Isis Terry is aware that IML's top salespeople make deceptive earnings claims and has access to the database IML has used to track those earnings claims. She has communicated with payment processors about IML's high chargeback rates and is aware that multiple payment processors have terminated IML's account due to concerns about consumer harm. She is also aware of multiple U.S. and foreign law enforcement actions against IML, and of numerous consumer complaints about IML's Trading Training Services and the Business Venture. Defendant Isis Terry regularly attended weekly IML executive conference calls during which IML chargebacks, law enforcement actions against IML, IML salespeople's deceptive social media posts, IML's Income Disclosure Statements, and IML's compliance measures were repeatedly discussed. Together with her husband, Defendant

9

Chris Terry, Isis Terry has received at least $20 million from Defendants' scheme. Isis Terry resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

22.     Defendant Jason Brown has been, at times relevant to this Complaint, a Vice President of Field Operations at IML, a top salesperson for IML and a managing member and owner of GDN. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices described in this Complaint. Brown has made deceptive earnings claims in selling IML's Trading Training Services and Business Venture. As an IML vice president and close advisor of Chris Terry, Brown is aware of deceptive earnings claims made routinely by other salespeople and instructors. He has discussed with Chris Terry how to handle salespeople's earnings claims and how to respond to foreign law enforcement actions. To further IML's scheme, he has hired a third party to post fake positive reviews about IML under a pseudonym. He has directed IML's compliance consultant to find ways to disable the social media accounts of individuals who have criticized IML's practices online. And he has advised top salespeople at IML on how to post deceptive earnings claims online in ways that will evade law enforcement. Defendant Brown has received more than $36 million from Defendants' scheme, including $3 million in direct payments and $33 million in payments to GDN. Brown resides in Florida and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

23.     Defendant Alex Morton is a "Chairman Elite" and Executive Vice President of Sales for IML. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices described in this Complaint. He is IML's highest paid salesperson and makes deceptive

earnings claims to lure consumers into the IML scheme. For his success in doing so, he has received over $76 million from IML. He is also the beneficiary of a contract with IML, under which he is reimbursed up to $10,000 per month for "travel and entertainment" expenses. Morton is aware of deceptive earnings claims made by other salespeople and IML instructors. He has advised top salespeople on how to post deceptive earnings claims online in ways that will evade IML's compliance program and law enforcement. Morton has also on numerous occasions intervened with IML's compliance staff and executive officers on issues ranging from salesforce compensation and retention to disciplinary and recruitment matters. Morton resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

24.    Defendant Matthew Rosa, also known as Matt Rosa, is a top salesperson for IML and a managing member and owner of GDN. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices described in this Complaint. As one of the most highly paid salespeople for IML, Matt Rosa makes deceptive earnings claims and engages in telemarketing to sell IML's services. Defendant Rosa is aware of numerous deceptive earnings claims made by other salespeople and IML instructors. He has advised top salespeople at IML on how to post deceptive earnings claims online in ways that will evade law enforcement investigators. He has also directed and coached IML salespeople on how to telemarket IML's services. Defendant Rosa, along with his business partner Defendant Jason Brown, has received more than $33 million from Defendants' scheme through payments to Rosa and Brown's company – GDN. Defendant Matt Rosa resides in Florida and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

25.    Defendant Brandon Boyd is an IML salesperson and instructor. At all times

11

relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices described in this Complaint. Boyd narrates IML training videos teaching consumers how to recruit consumers to the IML scheme. He is one of IML's highest compensated salespersons. Boyd makes deceptive earnings claims and is aware of deceptive earnings claims made by other IML salespeople and instructors. He engages in telemarketing to sell IML's services and directs IML salespeople to use deceptive earnings claims to telemarket IML's services to consumers. Defendant Boyd has received more than ▮▮▮▮▮▮ from Defendants' scheme. Boyd resides in Utah and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

### COMMON ENTERPRISE

26.     Defendants IML, IML UK, Assiduous, and GDN (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive and unlawful acts and practices and other violations of law alleged below. Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations, and that commingled funds. Because these Corporate Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below. Individual Defendants Chris Terry, Isis Terry, Jason Brown, Alex Morton, Matt Rosa and Brandon Boyd have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

### ALTER EGO

27.     As stated in Paragraphs 16, 17, 21, and 26, there is such a unity of interest between IML, IML UK, and Isis Terry that IML UK is the alter ego of IML and Isis Terry,

12

individually and/or collectively. IML UK is dominated and controlled by Isis Terry, directly or through others involved with the scheme, and was created to facilitate the IML scheme.

28.     Failure to disregard IML UK's corporate form would sanction a fraud and injustice by shielding and safeguarding IML UK from liability for its role in a deceptive scheme that has caused more than $1.242 billion in consumer injury worldwide, and unjustly enriching IML UK, IML and Isis Terry by permitting them to keep moneys obtained from consumers through fraud.

29.     This Court has personal jurisdiction over IML UK because IML UK is the alter ego of IML and Isis Terry, individually and/or collectively.

## COMMERCE

30.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

31.     Defendants operate a massive scam that has harmed hundreds of thousands of consumers in the United States and worldwide. Defendants focus their marketing on young people, many of whom are Black and Latino. The scheme has disproportionately harmed young Black consumers.

32.     Defendants sell their bogus Trading Training Services and Business Venture through a network of salespeople who are participating in IML's multi-level marketing scheme.

33.     At all times relevant to this Complaint, the Defendants' acts or practices described below that involve foreign commerce are also deceptive and unlawful acts and practices because they cause or are likely to cause reasonably foreseeable injury within the United States, or involve material conduct occurring within the United States.

13

### **Defendants' Trading Training Services**

34.    Defendants claim to teach consumers how to trade profitably in the foreign exchange, binary options, cryptocurrency, and securities markets.

35.    Defendants have sold dozens of different Trading Training Services using the same sales pitches, with the names and prices of the services changing over time. At times relevant to this complaint, Defendants have sold the following Trading Training Services:

- FRX Academy, a/k/a "the Foreign Exchange Course;" a/k/a "Foreign Exchange+" – training on foreign exchange, or "forex," trading,

- TBX Academy f/k/a "HFX Academy" – training on binary options trading,

- DCX Academy – training on cryptocurrency trading,

- The Stocks and Crypto Course, a/k/a "Stocks & Cryptocurrency+" – training on trading cryptocurrency and stocks, and

- SFX Academy – training on trading in the stock and futures markets.

36.    Purchasers of Trading Training Services have paid IML between slightly over $100 to nearly $500 to sign up. Thereafter, IML automatically renews consumers' memberships, charging between slightly less than $100 to nearly $400 every four weeks, unless or until the consumer cancels the auto-renewal.

37.    IML gives Trading Training Services subscribers access to a members-only page on its website where they can access prerecorded content about trading and virtually attend live webcasts (dubbed "GoLIVE" sessions) with IML instructors.

38.    Frequently, after consumers purchase one of the Trading Training Services, IML salespeople, including IML's instructors, have urged consumers to purchase additional Trading Training Services, representing that these additional services—called "Add-Ons," "Market Tools," or "strategies"—will tell consumers when to buy and sell various currencies and other

14

financial instruments to make a profit. The "Add-Ons" have cost slightly over $100 initially, and have been offered for a specific period, typically four weeks. Thereafter, IML has automatically renewed consumers' "Add-On" subscriptions, typically charging slightly less than $100 every four weeks, unless or until the consumer cancels the auto-renewal.

39.     Defendants represent that subscribers will or are likely to make substantial profits through executing the "strategies" the Trading Training Services provide. Defendants have no reasonable basis for this claim or data to back it up. In fact, numerous IML subscribers have lost substantial sums of money trading financial instruments, on top of the hundreds if not thousands of dollars they paid IML. Indeed, in communications with journalists and financial institution representatives, Defendants admit they have no substantiation for their claims that consumers are likely to make the advertised profits or income.

### Defendants' Business Venture

40.     Defendants offer consumers the opportunity to participate in a multi-level marketing scheme as salespeople for IML, and they have represented that consumers can earn lucrative commissions for recruiting others to join IML as a salesperson or IBO. IML refers to its salespeople as "independent business owners" or "IBOs"; this Complaint refers to those individuals as "salespeople" or "IBOs." IBOs pay a fee to IML of $24.95 a month to be eligible for commissions and bonuses.

41.     IML's salespeople have earned commissions and bonuses based on how many consumers they have recruited to become IBOs and to purchase Trading Training Services. The more new salespeople and customers a salesperson recruited, the more commissions and bonuses that salesperson earned. This business structure is also referred to as an "MLM," "direct sales," or "network marketing."

15

42.     IML has ranked its IBOs from "Platinum 300" to "Chairman 750," based on their sales volume, with advancement in rank corresponding with increased commissions and bonuses. Chairman 750 IBOs purportedly can earn $750,000 a month. Defendants sometimes refer to high earning salespeople as "leaders," and the salespeople who were recruited by them as their "downline" or "team." Under the new "IYOVIA" brand, salespeople with greater sales volume also earn higher commissions, although the top earners receive the rank of "Titanium" rather than "Chairman."

43.     IML's IBOs are agents of the Company. IML sets the terms under which salespeople are compensated. IML provides its salespeople with policies regarding how to present its Trading Training Services and Business Venture to prospective purchasers, including what methods they use to communicate and how much they may charge for live events. At times, IML reviews salespeople's marketing materials and makes changes to those materials. IML has the ability to discipline and terminate IBOs for failing to follow Company policies.

44.     Contrary to their representations to prospective IBOs, Defendants know from their own data that the overwhelming majority of IML IBOs lost money or earned very little. This fact is noted in IML's poorly disclosed "Income Disclosure Statements." Even though, as discussed below at Paragraph 105, Defendants have deceptively inflated the money that IBOs earn in the various versions of the Income Disclosure Statement, analysis of the statements still shows that only one IBO out of five makes more than $500 a year.

## Defendants' Advertising

45.     IML's first contact with a consumer is typically through a social media post, often posted by a friend or acquaintance of the consumer who is an IML IBO. IBOs often post images of purportedly successful trades, or the accoutrements of a luxury lifestyle on Instagram, Facebook, YouTube, TikTok or other social media platforms. The consumer views the social

media post and contacts the IML salesperson. The IML salesperson then communicates with the consumer, frequently through a telephone call, to pitch IML's services. In many other cases, the IBO initiates contact with the consumer directly, often through a telephone call or text message.

46.     Typical IBO pitches, which are frequently made on a telephone call with a consumer, represent that consumers can make a lot of money trading in the financial markets and invite the consumer to attend a webcast, telephone call, or live event with the IBO's "mentor" to learn more about the opportunity.

47.     Typically, at the webcast, telephone call, or live event, another IBO tells the consumer that joining IML is a pathway to wealth and financial freedom through trading in the financial markets. Consumers are often told that if they purchase a Trading Training Service, IML will teach them how to trade profitably in the foreign exchange, binary options, cryptocurrency, or securities markets. If a consumer attends a webcast or live event, IML IBOs will often arrange follow-up "three-way calls" where the consumer is introduced over the telephone to a higher-level salesperson, who will make similar earnings representations.

48.     The IBOs often highlight to consumers the purported credentials of IML's instructors, making false or deceptive claims, such as that consumers who follow the instructor's advice will make money trading, or that the instructors are audited by the FTC.

49.     IBOs often pressure consumers to purchase one or more Trading Training Services on the spot and on follow-up telephone calls after the webcast or live event. The IBO making the sale is often referred to as the purchaser's "mentor."

50.     Typically, shortly after the consumer makes an initial Trading Training Services purchase, the "mentor" or another IBO contacts the consumer—frequently by a telephone call—and represents that the consumer can earn significant income by becoming an IML IBO. The IBO encourages the consumer to recruit two new consumers to purchase the Trading Training

17

Services.

51.     Under IML's "Two And It's Free" or "Customer Reward" program, consumers can access the Trading Training Service they purchased for free if they get two consumers to purchase the same service. This incentivizes consumers to promote IML to others. Defendants often represent that consumers can use the money they earn through the Business Venture to trade in the financial markets, and thereby earn even more money.

52.     Defendants—through their high-earning IBO "leaders"—instruct IBOs to use earnings claims in sales efforts. For example, IML salespeople have instructed other IBOs to post images of a luxury lifestyle on social media to entice consumers to inquire about IML. High-earning Chairmen have told other IBOs to pique consumers' interest in IML by asking them if they would be interested in learning a skill what would teach them how to "multiply" their money. They have also instructed IBOs on how to get "prospects" on three-way calls with other IBOs in order to pitch IML's Trading Training Services. And Defendant Morton has instructed IML salespeople to sell IML Trading Training Services and the Business Venture wherever they go—including to baristas and waiters that they encounter in their daily lives.

*Defendants Promote the Trading Training Services and Business Venture*
*As Easy Paths To Wealth*

53.     Defendants, both directly and through IML salespeople, have routinely disseminated deceptive income claims online, over the telephone, and through other means, in promoting their Trading Training Services and the Business Venture. Below are examples of typical claims. The date a claim was posted on social media is noted below; the claims may have been available for months or years after they were first posted.

    a.    All of IML's compensation plans for the Business Venture, from 2017 through April 2024, state: "Our compensation plan pays out through six (6) powerful ways and is one of the most lucrative opportunities in the industry!"

18

b.  At an IML live event in September 2023, IML's then-Chief Operating Officer ("COO") stated that "because of the financial opportunities and the personal development opportunities" offered by IML, "peoples' lives drastically change."

c.  Defendant Morton, in the October 2022 social media post depicted below, wrote "It wasn't until THAT MOMENT I knew some how [sic], some way, I could eventually turn (at the time) my yearly income into my weekly income. Sounds crazy I know but once you realize the power you have as a human being (unlimited) you'll expand your mind, grow your awareness, increase your actions, & have the ability to 100X your results."



**Figure 1**: Screenshot of Defendant Alex Morton's Social Media Posting.

d.  Defendant Morton posted on Instagram, in April 2024, the following image:



**Figure 2**: Screenshot of Defendant Alex Morton's Social Media Posting.

He also posted two videos on YouTube entitled "Skyrocket Your Income" and "Earn Your First 100K" in April and August 2024. Both videos were available on YouTube as of December 4, 2024.

e.  Defendant Rosa, in an August 2019 social media post, wrote, referring to Defendant Brown: "We've traveled the world, dealt with having negative in bank accounts, have made 8 figures together, have taken care of our families, and have always had each other's backs through it all."

f.  In a June 2019 Instagram post, Defendant Jason Brown wrote: "I have traveled to 42 countries at the age of 29, impacted hundreds of thousands of people, retired my parents, given to my church and earned millions myself."

g.  Defendant Boyd, in a September 2019 social media post, stated: "Over the next

six months I will create more six-figure earners than at any time in my career. If you're ready to be one of them comment below IM IN." He then used the following hashtags: #imacademy #millionaire #money #im #wealth, and #billionaire.

h.  In another January 2023 YouTube post, which was available online as of April 9, 2025, Boyd boasted of bringing in "200,000 new customers" and "nearly half a billion in sales" with IML.

i.  A January 8, 2021 Instagram post by an IML IBO stated: "I've been preaching this for 2 years now. Been retired since the age of 23 and haven't worked a 9-5 since. Made way more money investing than i [sic] ever could off working."

j.  IML and its salespeople often use images and video to convey that purchasing the Trading Training Services and the Business Venture are pathways to wealth. A November 27, 2023 YouTube post on IML's channel, which was available online as of June 13, 2024, features video of top IML salespeople enjoying a luxurious Caribbean cruise, including drinks in a hot tub and visits to white sand beaches. The image below is a screenshot from that video.

1
2
3
4
5
6
7
8
9
10



11    **Figure 3**: Screenshot of IML Social Media Posting.

12    k.   An IML salesperson posted the following image on or about June 28, 2020 of

13         herself holding a stack of cash, alongside a receipt for a withdrawal from an

14         online broker:

15



26    **Figure 4**: Screenshot of IML Salesperson's Social Media Posting.

27

28                                        22

l.   In July 2020, IML's compliance staff captured over two dozen social media posts of Matt Rosa featuring Rosa on a private jet with Chris Terry, at a yacht party, with a BMW, Mercedes, and a Rolls Royce, and wearing a gold Rolex.

m.   An October 28, 2023 Instagram post by a top IML salesperson states: "Trading can be your ticket to wealth and success…Start your trading journey with people that has [sic] been doing it for years and have the results you want."

n.   On or about November 13, 2024, an IML salesperson posted to Instagram: "Thanks to AI trading, I was able to not only pay for my vacation but also make money while enjoying it…It's has giving me [sic] the financial freedom to live life on my own terms. 3pm & 9pm est THE LAUNCH WILL BE LIVE…IYOVIA Webinar." A screenshot of the post is below:



**Figure 5**: Screenshot of IML Salesperson's Social Media Posting.

54.   Defendants have routinely represented to consumers that the Trading Training Services will allow consumers to earn "money in minutes" trading, without effort or experience. They have claimed that consumers can simply "copy, paste and profit" by following trading

recommendations from IML instructors. They have represented that it is so easy to make money using the Trading Training Services that consumers can make money in their sleep. Defendants, both directly and through their salespeople, have disseminated numerous similar deceptive income claims, such as:

    a.   An IML salesperson posted on his Instagram account in July 2021 a screenshot of winning forex trades, along with the message "$$ MADE IN YOUR SLEEP! MEN LIE WOMEN LIE NUMBERS DON'T [sic] COPY PASTE PROFIT."

    b.   On or about May 13, 2021, an IML salesperson posted the following on Instagram:

        "TODAY MY TEAM AND & I WILL BE HAVING A FREE 1 DAY TRIAL/MASTERCLASS ON ZOOM TO SHOW YOU EXACTLY HOW WE MAKE MONEY IN MINUTES CLICKING BUTTONS ONLINE FOR 30-60 MINUTES DAILY TRADING HFX & HAVE THE REST OF OUR DAY TO DO THE THINGS WE ACTUALLY WANT TO DO AFTER MAKING A DAYS WAGES IN JUST A FEW MINUTES! INCLUDED IN THE FREE TRIAL SESSION WILL ALSO BE HOW TO COPY, PASTE & PROFIT FROM OUR DAILY CRYPTO SIGNALS!!"

    c.   On or about April 8, 2021, another IML salesperson included the following statement in an Instagram post: "Join my Telegram in my bio to learn how to make 'money in minutes' from your phone."

    d.   In an Instagram post that was available online in September 2021, an IML salesperson posted an image of purported profits made trading forex, with the caption "Our instructors told everyone in Tradehouse [a group of IML salespeople] to sell…Made $300 while I'm chilling in Bed."

e.  On November 7, 2024, an IML salesperson posted the following on Instagram,
    touting IYOVIA's "AI education and trading platform" that allows consumers to
    make "money in minutes":



**Figure 6**: Screenshot of IML Salesperson's Social Media Posting.

55.     Defendants have routinely promoted their Trading Training Services with claims
about the trading success and skills of IML instructors. Salespeople often describe the instructors
as "7 figure master traders" that will "be helping you get results your first 24HRS in!" Moreover,
IML salespeople have falsely claimed, in Zoom meetings and in social media posts, that IML
instructors are audited by the FTC. For example, one IML salesperson stated, in a social media
post available in June 2024, that ". . . I know that I'm partnered up with the best in the world.

The people that I decided to learn from are heavily audited by the FTC and have been in this industry for over a decade."

### *IML Targets Young People, Including Black and Latino Young People*

56.     IML has promoted its Trading Training Services and Business Venture by marketing to young people, particularly young Black and Latino consumers. Defendants know that their scheme benefits from promotion to young people. As Defendant Chris Terry wrote to Defendant Jason Brown: "That's the great thing about network [marketing]...They keep making new 18 year olds everyday." Defendants' salespeople have marketed IML via posts to the social media pages of colleges and universities, and often pepper their posts with slang commonly used by young people. And IML leaders, including Defendant Morton, have recommended that when selling IML in person, salespeople should ask consumers, "[y]ou go to school man?"

57.     IML's targeting of young adults and minors has drawn attention from foreign law enforcement authorities. For example, in December 2017, France's financial markets regulator (Autorité Des Marchés Financiers) issued a public warning against IML noting that the company was "specifically targeting very young people, including high school students."

58.     In March 2022, several IML IBOs were arrested by the Spanish National Police for, among other things, targeting adolescents for recruitment into IML.

59.     On May 24, 2023, Luxembourg's main financial regulatory authority, Commission de Surveillance due Secteur Financier, issued a public warning about IML for, among other things, targeting youth on social media. And, on May 28, 2023, local police in Kirchberg, Luxembourg, raided an IML sales event and arrested several IBOs who had been targeting secondary school students for recruitment.

60.     IML is aware that numerous minors have purchased IML's Trading Training Services.

26

61.     Defendants have targeted Black minors and young adults. For example, a July 2020 Instagram post by an IML salesperson promoted a Facebook Live sales event with the title "Trade Talk with Rich Nation – Teen Edition." The event poster featured photos of a Black "17 yr old" and a Black "19 yr old," and stated that consumers who attended the event would "hear how these teen investors are changing the game and leading the path for many like-minded teens who want to get a head start on investing." The post included the hashtags "#blackwallstreet," "#businessowner," "#blackexcellence," "#retiredat19," "#retirerich," and "#teenedition." Furthermore, Defendants have promoted connections to influential Black pop culture figures.

62.     IML salespeople have also targeted Latino consumers by advertising Spanish language events and promoting Spanish speaking instructors. Moreover, IML salespeople have promoted IML to Spanish-speaking Latino minors via social media. For example, a January 2023 Instagram post stated—in Spanish—that IML "is designed so that someone who is 11 years old can master it."

63.     At an IML live event in September 2023, a salesperson ranked by IML as a Chairman 50 (i.e., someone earning $50,000 in commissions each month) stated: "I was working at a Subway, like 8 or 9 years ago, and honestly growing up Latino, you do not think of having many opportunities in the world. So I am very grateful for this company…I mean this company—I cannot say anything about income—but this company took from me here [gesturing to the floor] and got me to here [gesturing to the ceiling]. And there is no other company or opportunity that could have done that for me."

64.     Another IML salesperson posted on Instagram on or about August 20, 2020: "This Forex stuff getting out of hand! I ain't never seen this many people quit their jobs like this. People young as 15 years old making 6 Figures from their phones."

65.     Defendants relied heavily on David Imonitie, a Black IBO, in marketing to Black

consumers. Defendant Brown, in a May 2019 text message chat with an IML salesperson, asked

why IML should send David Imonitie to an event in St. Louis. The salesperson responded:

> Because the demographic is blacks bro[.] They need to see a [Black person] come up[.]
> Like that's all they need to see to believe[.] Rich black people[.] Out here man they don't
> tell them how to come up so him teaching bro it will be stupid…Avg income is like 30-
> 40k a year…Promote 'highest paid African American in industry, teaches how to be
> successful' or sum like that lol.

Brown responded to the above with "Lol."

66.    Defendants promoted Imonitie as a highly-paid Black entrepreneur in their

marketing targeting Black consumers, such as in the following typical advertisements:

a.    In a May 2019 post, an IML salesperson and instructor wrote: "Unlock Wealth in

the Largest Financial Market in the World. . . Join Millionaire Mentor, Chairman

500 David Imonitie, now the highest paid African-American Home Based

Business Income Earner in the World for an ELECTRIFYING NIGHT right here

in New York City you don't want to miss! Learn how to successfully navigate the

5.3 Trillion Dollar Forex Market to create an income right from your phone and

how David was able to generate a million dollar monthly income! The Financial

Revolution is Here."

b.    In a May 14, 2019 Instagram post, Defendant Morton promoted David Imonitie as

the "the highest paid African American in our profession."

c.  In the July 2020 advertisement depicted below, IML represented that consumers could "[l]earn from the highest paid African American in the industry how he jumpstarted one of the largest financial movements of this generation…and how you can create massive results for your family:"



**Figure 7**: Screenshot of IML Salesperson's Social Media Posting.

67.     IML—through its salespeople—have also used hashtags and "stickers" on Instagram to target Black consumers. Instagram users can search for posts by searching for a hashtag, and by clicking on a specific hashtag, users can see other posts with that same hashtag. Stickers on Instagram are a graphic element users can add to their posts, which can make it easier for other users to locate the post. The following social media postings are typical examples of Defendants' targeting of Black consumers through Instagram tagging and "stickers" between

November 2020 and May 2021:

    a.  One IML salesperson posted "#forexfunded #fireyourbosshireyourphone

        #iphonemoney" and #millionairementor," along with the hashtags

        "#blackcreative" and "#blackwomeninbusiness."

    b.  Another Instagram posting by an IML salesperson used the hashtags

        "#luxurylifestyle #millionaire #millionairementor #blackexcellence #melanin

        "#blacktravelfeed" and "#blacktravel."

    c.  Another IML salesperson used the sticker "Share Black Stories" in a post which

        purported to show trading profits available with an IML Add-On service.

*IML Capitalized on Consumers' Financial Fears Related to the COVID-19 Pandemic*

*"We have the world's perfect business. Now with the globe falling apart…" Defendant Chris Terry speaking on a call with IML salespeople on March 17, 2020*

    68.    IML took advantage of consumers' fears about the economic hardships caused by the COVID-19 pandemic to induce consumers to purchase IML Trading Training Services and the Business Venture. The following social media posts are typical examples:

    a.  In an Instagram post that was available on June 24, 2020, an IML salesperson

        with the rank of Chairman 10 (i.e., someone earning $10,000 in commissions each

        month) posted: "The NBA shut down because of a virus. Robinhood won't save

        you. Bitcoin on cash app won't save you[.] That 401k you had hopes of retiring

        with definitely won't save you. Lol[.] Multiple streams [of income] & a plan of

        action will ... All I can say is [that] [t]hese last few months have changed history

        drastically. 401k's, Savings plans, US Markets are all depreciating." She then

        posted an image of winning forex trades, with the caption: "Of course y'all can

        watch. Just don't be the people who watch forever and never succeed for

        themselves."

b.  Another IML salesperson posted the below image on Instagram on or about March 5, 2021, along with the following statement: "I'm now hosting private webinars to show you how I made 6 figures in 6 months at 23 [years old] from my phone…I literally get paid to use my social media[.] Now it's your turn[.] Working is no longer an option for me in 2021 because there's no more job security at this point. This is the easiest time to get rich. Let me show you how to turn the pandemic into a BANDemic." The salesperson referred to a "band," which is $1,000 in cash.



**Figure 8**: Screenshot of IML Salesperson's Social Media Posting.

c.  Another IML salesperson posted forex trading profits with the caption "The only thing keeping me sane during this pandemic…a real life safety net. TAP IN."

69.  IML, through its salespeople, also urged consumers to use funds received through various COVID-19 relief and stimulus programs to purchase Trading Training Services. The following social media posts are typical examples:

a.  In a post that was available on Instagram on or around November 10, 2021, an IML salesperson posted: "Learn a skill family…They don't teach this in school…I'm doing a $160 promo to get started instead of $325[.] That stimulus check is coming!!! Invest invest don't [sic] spend to spend. Multiply your funds!!"

b.  In another post, available online on or about January 5, 2021, an IML salesperson posted the following text message exchange: "Those are some big boy HFX trades…My Mom used her stimulus check to triple it in minutes lessss gooo." The IML salesperson added a caption with the words "This is what we do."

**<u>Defendants' Representations Are Deceptive</u>**

70.    In numerous instances, representations such as those described in Paragraphs 53-55, 64, and 66-69 were deceptive, false, or unsubstantiated, for the reasons discussed below.

71.    Defendants have no substantiation for their trading success claims. By its own admission, IML has taken no affirmative steps to ascertain whether consumers who use its Trading Training Services are reaping the profits that Defendants' marketing promised. In fact, IML has no information on whether these consumers are trading in the financial markets. Indeed, Defendants are aware of many purchasers incurring trading losses.

72.    Moreover, Defendants' claims of offering top-notch investment training are belied by how quickly consumers stop paying for the Trading Training Services. Based on IML data, 90% of purchasers drop the services within six months. And nearly 60% drop their Trading Training Services within a month. With such retention rates, it is little wonder that IML does not solicit evaluations from its students regarding the quality of its Trading Training Services. Needless to say, the FTC does not audit IML instructors.

73.    Defendants are also well aware that the vast majority of IBOs make very little

32

money, if any, and most quit shortly after signing up.

74.    IML has also generated persistently high chargeback ratios. Historically, one of the primary indicators a merchant is engaged in fraudulent conduct is a high chargeback rate.

75.    Chargebacks occur when customers contact their credit card issuing bank to dispute a charge appearing on their credit card statement. The card networks (e.g., Visa and MasterCard) have chargeback monitoring programs designed to flag merchants with excessive chargeback rates (e.g., 100 or more chargebacks in one month, and a monthly chargeback-to-transaction ratio of .9% or greater). Merchants placed in excessive chargeback programs are subject to additional scrutiny by the card networks, as well as possible fines and termination.

76.    IML's merchant accounts were repeatedly placed in chargeback monitoring programs due to high chargebacks, and the Company had numerous merchant accounts closed due to high chargebacks and payment processors' concerns about the legality of IML's marketing practices.

77.    Repeatedly, since at least 2018, Isis Terry has communicated with payment processors regarding concerns those processors have raised about IML's high chargebacks, consumer complaints, and international legal actions taken against the Company.

78.    IML has also struggled to open new merchant accounts because of its deceptive earnings claims and related problems, such as excessive chargebacks. For example, an IML staff person informed Defendant Isis Terry in a January 5, 2021 email that a payment processor denied IML's merchant account application because of the Company's "unrealistic earnings claims" and "excessive chargebacks that are beyond the standard threshold."

79.    As Defendant Brown informed other top IML salespeople in December 2020 — including Defendants Morton, Rosa, and Boyd — "Our chargeback ratio was greater than 1% for 3 years… When your chargebacks are over 1% no one wanna do business with you unless they

hold a reserve of 10+% of your money."

80.    In disclaimers that are neither clear nor conspicuous to prospective purchasers, Defendants admit that examples of successful trades used in their marketing, including in testimonials, are atypical and do not represent what purchasers are likely to achieve. Defendants' poorly disclosed disclaimers contradict the message conveyed by their marketing—that consumers who purchase the Trading Training Services are likely to reap substantial profits. For example, one disclaimer states: "We provide absolutely no guarantee that you will earn any money or achieve a financial goal using the methods, information and suggestions in the content provided."

81.    IML has also admitted—contrary to their marketing claims—that trading in the foreign exchange markets is extremely risky. The Company stated, in a letter dated June 18, 2018 to Truth in Advertising, Inc. ("TINA"), that "there is high risk when investing money in FOREX," which is a "volatile investment." IML went on to state that "[o]ur goal [in starting IML] was to give the novice a better than average chance of learning how to invest wisely."

82.    Similarly, in a May 12, 2021 letter to the British Broadcasting Corporation ("BBC"), Defendant Isis Terry wrote: that "[t]here is no guaranteed return on risk-based investments and any financial adviser will make this point. FX Markets is no different."

**Defendants' Trading Training Services Are a Sham**

83.    Contrary to Defendants' claims, the Trading Training Services did not provide consumers with an easy path to wealth trading in the financial markets. IML instructors typically have little experience or meaningful training, and no accreditation. Moreover, consumers who have purchased IML's Trading Training Services often complain that the materials covered in the video curriculum are available for free online. In May 2023, Defendant Brown confirmed that fact in sworn deposition testimony.

84.    Indeed, many of IML's purported top instructors are in fact salespeople acting as instructors and have woefully deficient backgrounds in the financial markets. Defendants are aware of this and that purchasers of their Trading Training Services have suffered as a result.

*Defendants' Bogus Instructors*

85.    Defendants have asserted that the "core value" of IML's Trading Training Services is in the GoLIVE sessions, led by IML instructors. Many of these instructors, however, lack any formal investment training, instead obtaining their "training" from IML or by watching videos on YouTube. Moreover, many of the instructors do not possess securities industry licenses or accreditation. And, contrary to Defendants' marketing claims, many of the instructors lack real-world trading experience and success.

86.    For example, one IML instructor, who served in that position for nearly three years, was advertised by IML as a "Master Educator." The instructor, however, had no formal investment training, no investment licenses or accreditation, and had only minimal trading activity in two small brokerage accounts.

87.    Another long-standing IML instructor, who was recruited by Defendant Chris Terry, was also touted by IML as a "Master Trader." The instructor has no formal investment training, possesses no investment licenses or accreditation, and his trading results were negative – making no profits from trading from 2018 through 2021. By comparison, during the same period, the total return for the S&P 500 index was over 78%.

88.    Defendant Boyd became an IML instructor in 2020. He too was promoted by IML as a "Master Instructor." But like many other instructors, his "training" constituted being an IML "student." He possesses ███████████████████████. And, as of September 2023, his trading activity amounted to ███████████████████████████. Boyd is featured as an "educator" for IYOVIA's "Foreign Exchange+" Trading Training

35

Service.

*Defendants and Instructors Know Marketing Claims about Instructors Have Been False*

89.    IML instructors have been aware that IML's marketing claims regarding their performance or credentials have been false. For example, IBO and instructor Lisaldo Tavarez was marketed to consumers to be a "Top Educator;" however, in September 2021 he admitted to a group of senior salespeople that "Yeah thats why I be honest and tell people im [sic] not a guru trader I actually really suck just do teacupsn [sic]" – "Teacups" being a purported strategy utilized with an Add-On product called "Gold Cup."

90.    Likewise, IBO and instructor Gustavo Alaniz, who IML touted to be a "Top Trader," told the same group of senior salespeople: "Yea I don't even go back and forth with [racial epithet deleted] when it comes to trading. I don't know shit about trading."

91.    Moreover, Defendants and their top salespeople have been aware that IML's training has been sub-par and harmful to consumers. For example, in late 2018, Chris Terry was informed that the instructors who presented GoLIVE sessions for an Add-On product called "Swipe Trades" were, contrary to IML's advertising, not "master traders," but unsuccessful traders touting trading results that "were artificially inflated and fabricated."

92.    IML executives have also been aware that Add-On products IML offered were not fit for purpose. For example, according to IML's former education director Spela Sluga, a number of IML's Add-On products such as "Vibrata" (a web analyzing strategy that purported to provide purchasers with both short-term and long-term market ideas) and "Delorean" (an allegedly proprietary strategy that purported to provide consumers with hundreds of market timing opportunities) were "glitching" and "not working."

93.    That IML instructors' backgrounds, knowledge, and trading results have been a far cry from what IML marketed to consumers is not surprising, given IML's minimal hiring

requirements. For most of IML's existence, the hiring of instructors has been a haphazard process. For example, prior to November 2021, "qualifications of instructors were not requested nor tracked" by IML. Since late 2021, prospective instructors are required to submit their trading history to IML, but candidates are not required to show success in trading to be hired and are also not required to submit information about education, prior work, licenses, or accreditation.

<u>*Most IML Instructors are Salespeople*</u>

94.     Most IML instructors are salespeople masquerading as top-notch investment professionals, looking to leverage their position as an instructor to build their downlines, and Defendants are well aware of that.

95.     For example, IML provided sworn testimony in federal court in May 2022 that IML IBOs want to become instructors "because it gives them more exposure as an IBO," leading to more consumers signing up with IML through that IBO, and greater compensation for the IBO. Likewise, Chris Terry testified in a July 2023 deposition that IBOs who became instructors would have "instant credibility" and "help [the IBOs to] have relevance in the company," which would "help them grow their business."

96.     Many of IML's instructors have been compensated based on the sale of Add-On products; not the performance of their "students" in the financial markets. However, IML has taken steps to hide the fact that many of its instructors are in fact salespeople. For example, in her May 12, 2021 letter to the BBC, Isis Terry unequivocally stated that "educators who provide the live training sessions are paid a fixed fee based on the number of sessions of teaching they provide."

<u>*Defendants Cover Up Damning Information about Their Instructors*</u>

97.     When IML gets evidence of false claims by IML instructors, the Company has gone to great lengths to hide it from consumers. For example, Matthew Thayer was a celebrated

IML instructor and leader between 2018 and 2021. Defendants lionized his trading prowess, and Defendant Boyd urged IML's salesforce to take Thayer's trading results and "[p]ost weekly" because that would "attract[] people to USE our services and education."

98.     Thayer, however, was a sham. IML discovered that he was doctoring his trading results, entering into undisclosed arrangements with unregulated offshore trading platforms, and that his "$15 million trading account" was fake. Ultimately, IML terminated Thayer.

99.     Thereafter, IML worked to cover up the scandal. In a chat group that included Defendants Chris Terry, Rosa, Brown, and Boyd, Thayer's misconduct was discussed. Brown then implored his fellow salesmen "[p]lease DO NOT screen shot and do not blast this in public."

100.     Another IML salesman suggested that the chat group delete the post discussing Thayer's conduct as "it getting out in this type of way in the wrong hands can do damage that we really don't need right now being that we've been promoting [Thayer's trading success] over a year. Which will make us look bad." IML's executives also believed that they should not disclose Thayer's conduct to IML consumers because, in the words of IML's Director of Education, Product Development, and Regulatory Compliance Anita "Ari" Barton, "if not handled properly, this will be a public reputation nightmare among other issues, especially since the broker interface was displayed on GoLive during [Thayer's] sessions."

**The Vast Majority of IBOs Earn Little or No Money**

101.     Defendants know that the vast majority of IBOs either lose money or make very little.

102.     An Income Disclosure Statement ("IDS") is a document that some MLMs use to summarize the earnings that consumers can generally expect if they join the MLM. IML's IDS is hard to find and can only be accessed through a link in small font at the bottom of IML's main

38

website, https://im.academy, or through a similarly nondescript link on the iyovia.com website.

103.     IML's income disclosure statements consistently show that the vast majority of IBOs make very little or no money. For example, IML's 2022 IDS, depicted below, shows that nearly 80% made less than $500 in 2022. For those salespeople, the average annual earnings was $77.51, and the median IBO made no money at all.



**INTERNATIONAL MARKETS LIVE INC.**
**INCOME DISCLOSURE STATEMENT**
JANUARY 2022 – DECEMBER 2022

The International Markets Live Inc. ("IML") opportunity and Compensation Plan is designed to provide our Independent Business Owners ("IBOs") the opportunity to earn commissions from educational services sold to customers through the IBO's replicated website. IML is committed to meeting all applicable legal and compliance requirements. This IML Income Disclosure Statement ("IDS") is designed to provide IBOs and prospective IBOs with information regarding the income that IBOs generate from participating in the IML Compensation Plan.

| Total 12 Month Earnings Tiers | Average 12 Month Earnings by Tier | Median 12 Month Earnings by Tier | % of Representatives by Tier |
|---|---|---|---|
| Over $500,000 | $1,293,206 | $929,302 | 0.03% |
| $250,000 to $500,000 | $345,341 | $337,691 | 0.04% |
| $100,000 to $250,000 | $151,824 | $139,800 | 0.10% |
| $50,000 to $100,000 | $67,595 | $63,875 | 0.16% |
| $25,000 to $50,000 | $33,807 | $32,425 | 0.27% |
| $10,000 to $25,000 | $15,150 | $13,978 | 1.35% |
| $5,000 to $10,000 | $7,106 | $6,972 | 2.43% |
| $1,500 to $5,000 | $2,781 | $2,590 | 6.36% |
| $500 to $1,500 | $874 | $810 | 9.90% |
| Under $500 | $77.51 | 0 | 79.37% |

These figures are not guarantees or projections of your actual earnings or profits. The above figures include only bonuses, commissions or other remuneration paid to IBOs by International Markets Live Inc. (IML). They DO NOT take into consideration any expenses incurred by IBOs in operating their businesses. Expenses incurred in operating an independent IML business may include, but are not limited to, the payment of initial and monthly IBO fees, transportation costs, training and educational expenses, and travel expenses. In some cases, these costs and expenses may exceed the amounts earned by IBOs from IML. IML makes no guarantee of financial success and you may lose money. Success with IML results only from successful efforts to make customer sales of IML products and services to end users. This requires hard work, diligence, skill, persistence, competence, and leadership. Your success in product/service sale will depend upon how well you exercise these qualities.

The earnings of each IBO's in this chart are not necessarily representative of the income that a IML IBO will earn through participation in the IML Compensation Plan. IML does not pay commissions for recruiting new IBOs. Rather compensation is based solely on product and service sales to end users which varies. The figures in this chart should not be considered as guarantees or projections of your expected actual earnings or profits.

This document has been created for use by IBOs in the US only and should not be presented as indicative of earnings by IBOs outside the US. This Income Disclosure Statement is intended to present the average income of IBOs in those US states where income claims are allowed. Income claims are not allowed in Massachusetts and Wyoming. Please consult with your local authorities for more information regarding income claims.

**Figure 9**: Screenshot of IML's Income Disclosure Statement, 2022.

104.     However, even the low earnings levels reported in the table in IML's IDS are misleading, as they omit significant fees that all salespeople must pay IML to be eligible for

commissions. For example, after accounting for the required payments to IML, in 2022, 83% of salespeople made $500 or less, and the majority of participants lost money. Indeed, as illustrated in the pie chart created by the FTC below, between 2020-2022, more than 99% of IML IBOs made less than $25,000 a year, with more than 80% making less than $500 a year.



**Figure 10**: FTC-Created Pie Chart Showing Annual Earnings of IML IBOs Less IBO Fees, 2020-2022

105.     And even those figures are inflated, because they do not account for any advertising costs or other expenses that salespeople might incur, such as travel and lodging at IML sales events and conferences. While IML admits that the IDS earnings figures do not take into account business expenses, that statement is hidden in fine print at the bottom of the document. Other IML Income Disclosure Statements are similarly deceptive.

**Defendants' Purported Disclaimers Do Not Cure Their Misrepresentations**

106.     Defendants occasionally include disclaimers at the bottom of some social media posts and also place disclaimers in hard-to-find locations on their website. Defendants' purported

disclaimers are ineffective and fail to cure Defendants' deceptive earnings claims.

107. Defendants' disclaimers are not prominently displayed. To find the disclaimer text on Defendants' website, which is found in IML's "Terms of Use," discussed below at Paragraph 151, a consumer would have to scroll to the very bottom of Defendants' websites' homepages and find and click a small text link. The link takes the user to a separate page displaying a lengthy disclaimer, in legalistic wording. Consumers are unlikely to see this disclaimer, and unlikely to read it if they do.

108. Defendants also fail to prominently display the IDS that they have intermittently updated. As with Defendants' main disclaimer, a consumer would have to scroll to the very bottom of Defendants' website's homepage and find and click a small text link to locate the IDS. The link takes the user to a separate page that displays the purported average and median earnings of IML salespeople based in the United States. However, IML's IDSs are deceptive for the reasons discussed above in Paragraph 105.

109. Other disclaimers, including on social media posts, are similarly not prominent, clear, or conspicuous. Even if read, the language of the disclaimers fails to prevent or dispel the misleading impression that consumers will obtain lucrative earnings conveyed by Defendants' marketing.

**Defendants Knowingly Profited from and Sought to Further Their Salespeople's Deception**

*"We want to be here in 10 years. That happens by staying under the radar." Alex Morton*

110. Since at least 2018, Defendants have knowingly benefited from the deceptive earnings claims made by IML's salesforce. And since at least 2020, Defendants have put into place policies to make it difficult for law enforcement and IML's own "compliance program" to detect IML salespeople's deceptive claims.

111. Defendants know that luxury lifestyle and earnings claims help convince

41

consumers to purchase IML's offerings. As one of IML's top salespeople reported to Defendants Boyd, Brown, and Rosa in a 2020 text message exchange with them and other top IML leaders, a consumer told him "Bruh all that motivational talking $#!+ is cool and you have been doing that for years, what made me get started is that I saw you bought [a] Maserati." And Brown told several of IML's top leaders in a text message exchange that included Morton, Rosa, and Boyd that it is "easy to get signups flashing profits."

112.    Defendants also know that, when higher-level salespeople in IML's marketing structure make earnings claims, lower-level salespeople emulate them. As Brown put it in the text message exchange noted above: "I keep logging onto Instagram and seeing chairman 25-50-100 posting profits...Then [Platinum] 600-1000 level leaders think it's ok." And Defendant Boyd noted in a June 2020 text message exchange: "So WHAT do we DO about all the pics and videos constantly showing watches, cars, and so forth? I just saw them again this very morning from our leaders in this very group. Again, our team [sic] FOLLOW WHAT they SEE us DO."

113.    Defendants are aware that IML's deceptive earnings claims are unlawful and would result in law enforcement action. For example, in a June 2021 message to top salespeople at IML, Chris Terry stated:

> I went through Instagram, I've been going through a lot of people's accounts, and I'm mortified by the lifestyle claims that we have. We're going to end up getting shut down by the feds. I promise you. This is horrible what's going on out there. It's not a good thing…I'm looking at myself, I'm looking at a lot of you top leaders' Instagrams. The jets, the watches, the diamonds, the cars…we got to [sic] adhere to certain laws that are in place. And if we don't then there's consequences. The consequences are that we will be shut down.

### _IML Admits Its Earnings Claims Are Deceptive to TINA and the DSSRC_

114.    In June 2018, the non-profit consumer advocacy group TINA shared with IML over 50 earnings claims made by its salespeople, including Defendants Chris Terry, Brown and Morton. IML's then-COO responded to TINA by stating that "[w]e absolutely agree that

42

unrealistic income claims, as well as any income claims on social media is not good. We acknowledge the fact that customers and IBO's [sic] have made posts on Facebook and Instagram, that may cast a negative shadow on iMarketsLive and is in direct non-compliance to our terms and agreement and Policies."

115. IML's then-COO further admitted that Chris Terry and Morton made claims on social media that were not in compliance with IML's policies and procedures. He represented that IML was removing the noncompliant claims, and that "[m]oving forward every one of our IBO's [sic] and Customers will be trained with 'Do's and Don'ts' in regard to any social media posts."

116. Despite these assurances, in 2019 TINA located an additional 200 noncompliant earnings claims made by IML and its salespeople. In December 2019, TINA submitted a complaint to the Direct Selling Self-Regulatory Council ("DSSRC") regarding IML's deceptive claims. The DSSRC is self-regulatory program affiliated with the Direct Selling Association, the national trade association for the direct selling industry. The DSSRC is administered by the Council of Better Business Bureaus. TINA attached to its DSSRC complaint the earnings claims it had located in 2018 and 2019, which included claims from Chris Terry, Morton, Brown, and Rosa.

117. In communications to the DSSRC responding to TINA's complaint, IML's counsel did not contest the merits of TINA's allegations. Instead, IML counsel represented that IML "will continue daily monitoring of social media and on-line postings and, of course, take action where necessary and consistent and compatible with FTC mandates and guidelines."

118. In September 2020, the DSSRC issued a decision regarding TINA's complaint. The decision noted that IML did not dispute that the earnings claims TINA identified violated IML's policies and procedures, and the DSSRC found that the removal of such claims was

"necessary and appropriate." The DSSRC's decision further stated that "IML agrees with the DSSRC that even truthful claims may be misunderstood and that an advertiser should possess and rely upon adequate substantiation for any truthful depiction of success."

### *Defendants' Fig Leaf Compliance Efforts*

119.    Repeatedly, IML has told consumer advocates, self-regulatory bodies, and payment processors that the Company strictly adheres to consumer protection laws by closely monitoring and enforcing IML compliance policies against deceptive earnings claims. IML has stated that it has the ability to and may sanction noncompliant salespeople by suspending commission payments or even terminating them as an IBO.

120.    In reality, IML's compliance program is a facade. While Defendants do have the capability to discipline salespeople by suspending payments or terminating IBOs, Defendants continue to let successful salespeople make deceptive earnings claims to sell IML's services without consequence. Moreover, Defendants and IML's compliance team members have conspired to further neuter the compliance program by instructing salespeople how to continue to make deceptive claims "under the radar" of the compliance program and law enforcement.

### *Defendants Do Not Follow Their "Three Strikes" Compliance Policy*

121.    The 2020 DSSRC decision noted that IML had informed the DSSRC that "a first-time violation [of IML's policies] by a salesperson will result in counseling and an initial warning letter from the Company;" a second violation "will result in a warning letter and a temporary suspension;" and a third violation "will result in a termination" of the salesperson. IML has repeatedly stated to third parties that it strictly applies this "three strikes and you're out" policy to its salesforce.

122.    Contrary to its statements to the DSSRC, IML does not and has not meaningfully disciplined and terminated salespeople that made deceptive earnings claims. Instead, IML

salespeople and top executives, including Brown, Morton, Rosa, and Boyd, have been richly rewarded with bonuses and "side deal" compensation for years, even though Defendants knew they were repeatedly using deceptive earnings claims.

123.     IML's compliance staff have received hundreds of reports of earnings claims by salespeople and have reviewed thousands of such earnings claims. Frequently, compliance staff have recommended the termination of salespeople who had made repeated deceptive claims, but those recommendations have often been overturned by Chris Terry. High-earning salespeople have enjoyed deference from compliance staff and Chris Terry, including more "strikes."

124.     In August 2018, an outside compliance consultant hired by IML wrote a report highlighting the biased and inadequate policing of earnings claims by IML, concluding:

> [IML has a] culture that is out of control based on a lack of, or no enforcement of the actual policies and procedures of IML in a standard manner across the complete IML ecosystem... A serious issue that should be addressed is that in many cases, the corporate executives of iMarkets Live, the VP of Sales, and several field Chairmen, have overridden the compliance directives of the in-house compliance team. Although, these situations have been well documented, it continues to leave iMarkets Live, vulnerable to both federal and state regulatory violation.

125.     In June 2019, IML's Senior Manager of Compliance wrote to IML's then-COO about several top salespeople's earnings claims. She noted that "suspensions are overruled mostly" and "we are losing grip on the [salespeople] again as word spreads that suspensions are over ruled" and compliance staff were being "blocked [on social media] and ignored."

126.     In 2021, another compliance staff person noted that many salespeople were claiming in social media posts that IML would allow consumers to earn "money in minutes," and that this claim was a violation of IML's policies.

127.     In September 2021, IML retained "Ari" Barton, who flagged numerous deceptive earnings claims by multiple top IML sales leaders, including David Imonitie, Jaylin Goss, and Bryce Thompson. Although all three individuals had long histories of documented earnings

45

claims compliance violations, none was terminated. Goss was suspended, but Chris Terry approved the payment of his lost commissions during his suspension. Imonitie, who was paid over $30 million by IML, ultimately left the Company to start a competing venture.

128.    Chris Terry was well aware of IML's salespeople's deceptive earnings claims and chose to continue benefiting from their deception. For example, in a 2021 text exchange with a salesperson in Bryce Thompson's sales team, Terry wrote that Thompson and his sales team engaged in "[d]eceptive marketing," and "predatory marketing [to] [m]inors[,] 14-16 year olds." He also noted that the team's success was "all based on bullshit claims" and "we have [an] FTC investigation for all their shit that was allowed and encouraged." Despite this knowledge, Terry continued to authorize the payment of large sums to Thompson and his team. As Defendant Brown remarked to Chris Terry in a 2021 text, "Bryce [Thompson] should be kissing your feet...Seriously...You let all his leaders off the hook basically."

129.    Defendant Brown has also interceded to prevent IML's compliance staff from disciplining top salespeople in accordance with IML's stated policies. In May 2023, he pressured compliance staff at IML to be lenient with top salesperson Michael Angel Martin. Even though Martin had committed multiple violations of IML's compliance policies and had repeatedly been found to be making deceptive earnings claims, Brown pointed out that Martin was "extremely valuable to our business" and a "top customer recruiter [of] all time." Ultimately, Martin was only suspended for seven days, even though he should have been terminated under IML's policies.

130.    Between 2018 and 2023, 21 top salespeople and instructors—collectively paid over $242 million by IML—repeatedly made deceptive earnings claims that violate IML's policies. However, rather than terminating them, IML continued to make lucrative payouts to many of them, including Defendants Brown, Morton, Rosa, and Boyd. As Morton commented to

another IML salesperson about other top leaders' deceptive claims: "It's insanely absurd…It's out of hand." That IML salesperson responded: "But you posting a private jet and [Rolls Royce] doesn't help lol."

<u>*Defendants Teach Salespeople to Evade Detection*</u>

131.    Not only have Defendants failed to enforce the compliance policies that IML itself has instituted and claimed to enforce, they also have sought to evade IML's compliance program and law enforcement review by making IML salespeople's earnings claims more difficult to locate.

132.    One way to search for posts about IML on social media sites is to search for or click on hashtags like "#IMAcademy." Another way is to view posts in which the Company is "tagged." One of IML's main compliance monitoring tools – Fieldwatch – scours the web for these types of hashtags and the use of IML's name.

133.    However, IML has instituted a policy that salespeople are not to use hashtags identifying the company. This policy was implemented at the urging of Defendants Brown, Morton, and Rosa, in order to evade FTC action against IML after Defendants learned about the FTC's action against Online Trading Academy. On September 7, 2020, while the DSSRC inquiry against IML was pending, an IML compliance employee announced the new policy to top salespeople for IML in a group text conversation. She shared a link to the policy, which provides: "It is prohibited to tag the company in any social media posts. ie. @imacademy[.] In addition, do not use any company related hashtags. Ie. [sic] #imacademy, #imarketslive." She also wrote: "Please remember to not tag the company in your social media posts."

134.    Thereafter, IML has repeatedly warned and disciplined salespeople who used the company's name in social media posts. For example, on March 25, 2021, IML compliance staff sent a "compliance notice" to a Chairman 10-level salesperson instructing the salesperson to "not

use any hashtags in your posts that mention the company." In another internal note dated September 11, 2020, a compliance staffer noted that she had instructed an IML salesperson to not "tag the company in any posts since this is highly frowned upon by the regulators."

135.    Defendants Brown, Rosa, and Morton have all been involved in the decision to not use IML's name in salespeople's marketing to evade FTC oversight. On or about June 10, 2020, in a text exchange that included Chris Terry and the head of IML's compliance team, among others, Defendant Morton wrote, in response to a suggestion that salespeople stop using IML's name on social media: "Yes. We CAN do this, will take time and effort but we CAN & SHOULD. We want to be here in 10 years. That happens by staying under the radar." Defendant Rosa replied: "I'm down for a blackout. None of us use company [name] as it is. And I'm down to hold [salespeople] accountable as well love the idea bro."

136.    In that same text chain, a member of IML's compliance team raised a point about the use of hashtags in social media, noting, "Company related Hashtags and the company being tagged in posts is what leads to posts to being connected to the company. I would look at that as well. Some people have never been cited because they never tag the company in posts."

137.    Defendants Brown and Rosa also discussed how they could continue to make earnings claims without TINA or the FTC locating those claims. For example, Brown explained to Rosa why they included deceptive earnings claims in a sales video they had created : "It's an IM VIDEO... We put jets and cars all over the video. The psychological reasoning behind us doing that is to bring people into the business. & To show our team the dream." Brown also registered concern that if the FTC located IML's earnings claims, Brown and Rosa would be found liable for them: "FTC comes in, they make the law. Top earners go down with the company brother." Rosa responded that they should make the video private so it can only be seen by individuals with a link to it. That way, he said, TINA "can't find what they can't find."

48

138.    Defendants Brown and Rosa have also discussed how to use the "close friends" function on Instagram to post earnings claims on that platform so that, as Rosa put it in May 2021: "the FTC can't see it." Brown, after stating that IML was under FTC investigation, recommended that another IML salesperson only post earnings claims on the "close friends" setting. In a June 2020 text message exchange with high-level salespeople, including Defendants Boyd, Morton and Rosa, IML's then-COO, and the Company's head of compliance, Brown noted that: "the young leaders have started to use the close friends feature which is great to show lifestyle but not keep it public at all."

139.    IML salespeople and instructors have also used encrypted and private group chats (e.g., WhatsApp, Telegram and Discord) to share earnings claims with consumers without being detected by IML's compliance staff or law enforcement. In a March 2020 text message exchange, an IML instructor and IBO informed a group of top salespeople, including Defendants Brown and Rosa, that: "We post profits in our private group chats in [the] testimony section."

140.    Defendants have engaged in other practices to evade law enforcement review and to make it harder for consumers to locate accurate information about IML online. For example, Brown, on behalf of IML, hired a company to post fake positive reviews about IML online, using the pseudonym "George Torre." Brown also directed an IML consultant to find ways to disable or shut down the social media accounts of third-party critics of IML.

### U.S. and Foreign Government Actions

141.    Defendants have been subject to several criminal and civil law enforcement actions in the U.S. and abroad.

142.    On September 14, 2018, the Commodity Futures Trading Commission ("CFTC") filed charges against IML, finding it was an unregistered Commodity Trading Advisor that offered foreign exchange services to retail investors in violation of federal law. Specifically, the

CFTC alleged that IML "owned and operated a website, www.fxsignalslive.com, which exercised discretionary trading authority over some of IML's paid customers' trading accounts at third-party brokers." IML settled the matter with the CFTC and agreed to cease and desist from the violations charged and paid a civil monetary penalty. As a result of the CFTC's action, IML changed its marketing name from iMarketsLive to IM Mastery Academy.

143.    On May 25, 2016, the Canadian province of Quebec's financial regulator (Autorité Des Marchés Financiers) made an *ex parte* application to an administrative tribunal for an order against IML, Chris Terry, and a number of IBOs active in Quebec. The Quebec regulator alleged that IML, Terry, and the IBOs were: (i) unlawfully distributing securities; (ii) unlawfully acting as derivatives dealers; and (iii) pursuing an aggressive advertising campaign directed at "a young, vulnerable clientele." In addition, the regulator alleged that IML and Chris Terry were unlawfully acting as derivative advisers. On June 9, 2016, the administrative tribunal ordered IML, Terry, and the IBOs to cease all activities relating to the trading of derivatives or securities on behalf of others. It also ordered that IML and Chris Terry cease acting as derivatives advisors and block access to IML's website for residents of Quebec.

### Defendants' Deceptive Telemarketing

144.    Defendants have repeatedly directed IML salespeople to sell IML's Trading Training Services and Business Venture to consumers through telemarketing. For example, in a January 2024 video presentation by Defendant Morton that was posted and distributed via IML's YouTube account, Morton instructs IML salespeople on how to "prospect" and "close" sales, directing IML salespeople to "pick up the stinking fricking phone and talk to people," and to "pick up the phone and start dialing." The video presentation was available online on Alex Morton's YouTube account as of December 4, 2024.

145.    Defendant Matt Rosa has both engaged in telemarketing to sell IML's services to

consumers and directed IML salespeople to do so. He has provided instructions on what to say to consumers on sales calls. For example,

    a.  In a video from April 2021, which is available online as of April 9, 2025, Defendant Matt Rosa directs a group of salespeople to contact consumers on the telephone, telling the IBOs: "over the course of the next hour we're going to be making calls non-stop, following up with absolutely everyone…everyone in this room needs to be making calls…the first thing that you're going to do you're going to jump on the phone." In the video, Rosa states that he reached the Chairman level in 63 days by "picking up the phone, picking up the phone, picking up the phone." Rosa also states that he will coach individual salespeople about improving their telemarketing sales pitches.

    b.  In an August 2021 group chat with IML salespeople, Defendant Rosa directed them to repeatedly call consumers to sell them IML's services, and to tell consumers about IML's "drastic growth."

146.    Defendant Brandon Boyd has both engaged in telemarketing to sell IML's services to consumers and directed IML salespeople to do so. He has repeatedly boasted about his telemarketing for IML to Defendants Brown and Rosa. He has provided instructions on what to say to consumers on sales calls, including by instructing them to make deceptive earnings claims. For example:

    a.  In a series of training videos for IML IBOs, Boyd exhorts them to contact consumers over the telephone to sell IML's services. On the same training video where he tells IBOs to use "three-way calls" to sell IML's services, he directs IBOs to ask consumers questions like "what if there was a way to honestly teach you how to multiply your money? Would you want to know about it?"

51

b.  In a YouTube video from September 2022, which was available online as of April 9, 2025, Boyd tells salespeople to telemarket IML's services and provides a deceptive script with which to do so. In a PowerPoint presentation accompanying his video, Boyd directs IBOs to "[t]ext, DM, or call" people they know and ask them if they "ever thought about learning how to make money trading." If consumers say yes, salespeople should respond that they are "learning from a few VERY successful professional traders who have made millions of dollars in just a few years," and invite the consumers to a sales presentation.

147.    Moreover, IML's own policies anticipate that its salespeople will sell IML's Trading Training Services and Business Venture via telemarketing. IML's Statement of Policies and Procedures explicitly permits IBOs to make sales calls: (i) "in response to the prospect's personal inquiry or application" regarding an IML service sold by the IBO; (ii) to "family members, personal friends, and acquaintances"; and (iii) to consumers if the salesperson "has an established current business relationship with the prospect." And, in a presentation prepared by the IML head of compliance about the consequences of deceptive IML earning and lifestyle claims intended to be given at a June 2021 Chairman retreat attended by Defendants, the IML head of compliance specifically noted that such claims made during "telephone calls" were within the scope of the warning.

148.    Defendant IML, through its salespeople, has routinely made deceptive earnings claims to consumers via telemarketing, and IML has received complaints from consumers about IBOs' deceptive telemarketing practices.

**Defendants' Use of Negative Options**

149.    Defendants offer membership in their Trading Training Services, including their Add-On services, for a specific period, typically for four weeks. IML's Trading Training

Services include an auto-renew feature that is a negative option. Defendants have typically charged consumers between slightly less than $100 to nearly $400 every membership period (typically four weeks), unless the consumer acts to cancel. Thus, Defendants automatically renew consumers' memberships and the renewed membership charges are applied to the consumer's credit card or original payment method, unless and until the consumer cancels prior to the auto-renewal. IML has earned over $633 million in recurring fees from online sales of the Trading Training Services, which are transactions effected on the Internet.

**Defendants' Failure to Disclose Material Terms to Online Purchasers**

150.    In many cases, Defendants IML, Chris Terry, and Isis Terry (the "ROSCA Defendants") do not disclose or have not clearly disclosed all material terms of the transaction to purchasers who purchase IML's Trading Training Services online prior to obtaining the purchasers' billing information.

151.    The ROSCA Defendants purport to bind Trading Training Services' purchasers to numerous "Terms of Use," many of which are material, set out in an easily-overlooked page of their website. In numerous cases, the ROSCA Defendants do not clearly and conspicuously disclose to online purchasers all material terms of the transaction, as stated in the ROSCA Defendants' poorly disclosed "Terms of Use," including the following:

    a.    "We provide absolutely no guarantee that you will earn any money or achieve a financial goal using the methods, information and suggestions in the content provided."

    b.    "Any examples or demonstrations provided are in no way a guarantee or promise that an individual will make financial gains of any kind."

    c.    "The potential for earnings is totally dependent on the person using our site, products, services, methods and ideas."

    d.   "The information available through our products and services is provided by third parties and solely for informational purposes on an 'as is' basis at the user's sole risk. The information is not meant to be, and should not be construed as, advice or used for investment, financial planning, legal, accounting, or tax purposes. We make no guarantees as to the accuracy, quality, or completeness of the information and the company shall not be responsible or liable for any errors, omissions, inaccuracies in the information or for any user's reliance on the information."

152.    Until about June 2021, the ROSCA Defendants also purported to bind purchasers to additional "Terms and Conditions," many of which are material, set out in an easily-overlooked page of their website,. In many cases, the ROSCA Defendants did not clearly and conspicuously disclose to online purchasers all material terms of the transaction, as stated in the ROSCA Defendants' poorly disclosed "Terms and Conditions," including the following:

    a.   "There are major risks in trading, investing, and day trading online, which makes it unsuitable for everyone."

    b.   "This website does not provide or recommend a 'get rich scheme' or a 'make money scheme.'"

    c.   "Considerable risks in Futures & Forex transactions exist. Those risks include without limitation, leverage, creditworthiness, limited regulatory protection and market volatility that may substantially affect the price, liquidity of a currency or currency pair or Futures Contract."

    d.   "International Markets Live, Inc. does not represent itself as an Investment Advisor, or investing in Stocks, Futures, or Equities. We therefore do not provide any kind, whatsoever, of investing advice."

**Defendants' Failure to Obtain Express Informed Consent**

153.    In many cases, the ROSCA Defendants do not obtain consumers' express informed consent before charging them for Defendants' Trading Training Services in online transactions involving a negative option feature.

154.    In many cases, consumers seeking to purchase the ROSCA Defendants' goods or services have not been aware of the terms set out in Paragraphs 151-152, and have been otherwise unaware of the information those terms convey, including that the ROSCA Defendants expressly deny having a basis to reasonably anticipate that purchasers are likely to make substantial income by using the information provided by Defendants' Trading Training Services.

**Defendants Have Admitted That ROSCA Applies to Their Services**

155.    The ROSCA Defendants knew and admitted that ROSCA applied to IML's sales of the Trading Training Services.

156.    The ROSCA Defendants knew, because of consumer complaints they received and as shown through the ROSCA Defendants' own communications, that their actions have been deceptive and prohibited by ROSCA.

157.    On October 9, 2020, Isis Terry, as owner and CFO of IML, signed a merchant agreement addendum for an IML payment processor. That document states that IML "currently fully complies with, and during the term of the Agreement, shall fully comply with all relevant provisions of all of the following as amended from time to time: ...the Restore Online Shoppers' Confidence Act, 15 USCS 8401, et seq."

158.    In a January 23, 2021 letter from IML's legal counsel to another IML payment processor, counsel acknowledged that ROSCA applies to IML's sales and assured the processor that the "Company is compliant with the mandates advanced by ROSCA."

55

**Defendants Continued to Violate the Law Despite FTC Warnings**

159.    Defendants market their Trading Training Services by touting examples of supposed profitable trades, posting images and video of luxurious and expensive lifestyles purportedly funded by trading profits and IML commissions, and by claiming consumers can make consistent and substantial profits regardless of experience, wealth, or available time.

160.    Defendants' representations, including those cited above, conveyed to consumers the impression that purchasers of Defendants' services would or were likely to make substantial profits by taking Defendants' training courses. Defendants did not have an adequate basis to make these representations. In many cases purchasers who purchased IML's Trading Training Services did not make substantial income, and many lost money.

161.    Despite direct knowledge that many consumers were losing money trading, and that consumers who purchased the Business Venture were also losing money, IML chose to keep marketing the Trading Training Services and the Business Venture using unsubstantiated, misleading, and dishonest claims.

162.    In October 2021, the FTC sent a letter to IML, along with copies of the Synopsis Concerning Money-Making Opportunities and Synopsis Around Endorsements and Testimonials. The letter and Synopses identified specific acts or practices that the Commission has determined are unfair or deceptive and violate Section 5 of the FTC Act.

163.    As detailed in the Synopses enclosed with the letter, in a series of litigated decisions the Commission determined, among other things, that it is an unfair or deceptive trade practice to make false, misleading, or deceptive representations concerning the profits or earnings that may be anticipated by a participant in a money-making opportunity (i.e., a person who has been accepted or hired for, has purchased, or otherwise is engaging in the money-making opportunity).

164.    As the letter stated, the above acts or practices were prohibited by final cease and desist orders, other than consent orders, issued in the cases (cited in the Synopses) in which the Commission determined they were unfair or deceptive and unlawful under Section 5(a)(1) of the FTC Act. The letter warned IML of the Company's potential liability for civil penalties under Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), for knowingly engaging in acts or practices determined by the Commission to be unfair or deceptive and unlawful, as described in Paragraph 163 of this Complaint.

165.    The letter instructed IML to contact Commission staff if the Company had any questions or to visit the Commission's website at ftc.gov/MMO-notice and www.ftc.gov/endosement-notice-penalty-offenses to obtain copies of the case decisions discussed in the Synopsis.

166.    IML received the letter on October 27, 2021. On November 28, 2021, Chris Terry shared the Synopses through text message with, among others, IML's head of compliance and Defendants Brown, Morton, and Rosa. Chris Terry wrote in the group chat: "our risk is extremely high from these income claims...I am sure if [the FTC] investigates us the chairman10's and above will face legal issues. We do not want to swim in their waters as we will all lose… Should FTC come down on us. [sic] Expect a $20-30m in fines."

167.    On December 9, 2022, the FTC sent letters to Defendants Morton and Rosa, along with copies of the Synopsis Concerning Money-Making Opportunities. The letters were substantially similar to the one sent to IML, described in Paragraphs 162 to 165 above, but also stated that FTC staff was investigating whether IML, the recipients, or associated parties engaged in deceptive or unfair conduct.

168.    Defendants Morton and Rosa received the letters and the accompanying Synopses on or about December 9, 2022.

57

169.    Despite learning of the FTC's investigation and despite receiving the Synopses, Defendants IML, Morton, and Rosa continue to make deceptive earnings claims in marketing the Trading Training Services and Business Venture. And IML has failed to enforce its own compliance policy that requires that salespeople be terminated if they make three or more earnings claims.

170.    For example, on November 28, 2021, Chris Terry sent a text message to Garrett Roberts, a top salesperson for IML. Terry attached a picture of Roberts wearing a gold chain in a social media post. Terry told Roberts that he would face a suspension from IML for the post. Roberts responded "[o]nly person I [sic] seen flashing jewelry is your top guys…Talking about their watches." At the time Chris Terry texted Roberts, Roberts had already been reported seven times previously to IML's compliance staff for deceptive earnings claims. Instead of terminating Roberts, IML continued paying him commissions. As recently as October 31, 2023, Roberts was still being paid commissions by IML.

171.    Defendants IML, Morton, and Rosa also continued posting deceptive earnings claims after receiving the Synopses. For example, Defendant Rosa posted the following on Instagram on January 7, 2024:



**Figure 11**: Screenshot of Defendant Matt Rosa's Social Media Posting.

172.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things:

a.  Defendants engaged in their unlawful acts and practices repeatedly over a period of at least six years.

b.  Defendants engaged in their unlawful acts and practices willfully and knowingly.

c.  Defendants earned more than $1,242,531,875 from participating in these unlawful acts and practices.

d.  Defendants continued their unlawful acts or practices despite knowledge of

numerous complaints.

  e. Defendants continued their unlawful acts or practices after receiving civil investigative demands from the FTC.

  f. Defendants IML, Morton, and Rosa continued their unlawful acts or practices after receiving the Synopsis Concerning Money-Making Opportunities and IML continued its unlawful acts or practices after receiving the Synopsis Concerning Endorsements and Testimonials from the FTC.

  g. Defendants' unlawful acts and practices were the subject of prior law enforcement actions, yet Defendants continued to engage in such practices.

  h. Defendants disregarded IML's compliance rules and took active steps to undercut IML's own compliance program.

  i. Defendants took steps to conceal their identity from law enforcement.

**VIOLATIONS OF THE FTC ACT**

173. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

174. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

**Count I – False or Unsubstantiated Earnings Claims Regarding Defendants' Trading Training Services**

**(By Plaintiff Federal Trade Commission)**

**(All Defendants)**

175. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' Trading Training Services, Defendants represent, directly or indirectly, expressly or by implication, that purchasers will or are likely to make substantial profits by purchasing Defendants' Trading Training Services.

60

176.    The representations set forth in Paragraph 175 are false, misleading, or were not substantiated at the time the representations were made.

177.    Therefore, the making of the representations as set forth in Paragraph 175 constitutes deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II – False Earnings Claims Regarding the Business Venture

**(By Plaintiff Federal Trade Commission)**

**(All Defendants)**

178.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Business Venture, Defendants represent, directly or indirectly, expressly or by implication, that purchasers will or are likely to make substantial earnings by participating in the Business Venture.

179.    The representations set forth in Paragraph 178 are false, misleading, or were not substantiated at the time the representations were made.

180.    Therefore, the making of the representations as set forth in Paragraph 178 constitutes deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count III – Other Misrepresentations Regarding Defendants' Services

**(By Plaintiff Federal Trade Commission)**

**(All Defendants)**

181.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale or sale of Defendants' Trading Training Services, Defendants represent, directly or indirectly, expressly or by implication, that:

    a.   Consumers will or are likely to earn substantial income using Defendants'

services even if they have little to no experience in forex, cryptocurrency, binary options, or securities trading;

b. Consumers will or are likely to earn substantial income using Defendants' services even if they spend only a short amount of time each day or each week using the service;

c. Consumers will or are likely to earn substantial income using Defendants' services even if they do not have a substantial sum of money to invest; or

d. Defendants' instructors are audited by the FTC.

182. The representations set forth in Paragraph 181 are false or misleading or were not substantiated at the time the representations were made.

183. Therefore, the making of the representations as set forth in Paragraph 181 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### VIOLATIONS OF THE TELEMARKETING SALES RULE

184. In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.

185. Defendants and Defendants' salespeople are all "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(ee), (gg), and (hh). For purposes of the TSR, a "seller" is any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration. 16 C.F.R. § 310.2(ee). A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a

customer or donor. 16 C.F.R. § 310.2(gg).

186.    "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. 16 C.F.R. § 310.2(hh).

187.    Defendants' Trading Training Services and Business Venture are "Investment opportunity[ies]" as defined by the TSR, 16 C.F.R. § 310.2(s). The TSR defines an "Investment opportunity" as "anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation." 16 C.F.R. § 310.2(s).

188.    The TSR prohibits sellers and telemarketers from "[m]isrepresenting, directly or by implication, in the sale of goods or services. . . [a]ny material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability." 16 C.F.R. § 310.3(a)(2)(vi).

189.    The TSR prohibits sellers and telemarketers from "[m]isrepresenting, directly or by implication, in the sale of goods or services. . . [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer." 16 C.F.R. § 310.3(a)(2)(iii).

190.    The TSR prohibits any seller or telemarketer from "[m]aking a false or misleading statement to induce any person to pay for goods or services. . ." 16 C.F.R. § 310.3(a)(4).

191.    The TSR applies to "[c]alls initiated by a customer or donor in response to an advertisement relating to investment opportunities, debt relief services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or advertisements involving offers for goods or services described in § 310.3(a)(1)(vi) or § 310.4(a)(2) through (4). . ." 16 C.F.R. § 310.6(b)(5)(i).

192.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c) and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count IV – Deceptive Telemarketing Calls in Violation of the TSR

### (By Plaintiff Federal Trade Commission)

### (All Defendants)

193.    In numerous instances, in connection with telemarketing, Defendants misrepresent, or cause other to misrepresent, directly or by implication, material aspects of investment opportunities including, but not limited to, the earnings potential or profitability of Defendants' Trading Training Services and Business Venture.

194.    Defendants' acts or practices, as described in Paragraph 193, violate the TSR prohibition on misrepresenting any material aspect of an investment opportunity, 16 C.F.R. § 310.3(a)(2)(vi).

195.    Defendants' acts and practices, as described in Paragraph 193, also violate the TSR prohibition on misrepresenting any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer, 16 C.F.R. § 310.3(a)(2)(iii).

196.    Defendants' acts and practices, as described in Paragraph 193, also violate the TSR prohibition on making a false or misleading statement to induce any person to pay for goods or services, 16 C.F.R. § 310.3(a)(4).

### VIOLATIONS OF THE RESTORE ONLINE SHOPPERS CONFIDENCE ACT

197.    In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq.*, which became effective on December 29, 2010. Congress passed

64

ROSCA because "[c]onsumer confidence is essential to growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." Section 2 of ROSCA, 15 U.S.C. § 8401.

198.    Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the TSR, 16 C.F.R. § 310.2(w), unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumers' billing information and (2) obtains the consumer's express informed consent before making the charge. *See* 15 U.S.C. § 8403.

199.    The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

200.    As described above, the ROSCA Defendants (IML, Chris Terry and Isis Terry) charged consumers for IML Trading Training Services and related goods and services, including Add-On services, sold in transactions effected on the Internet through a negative option feature.

201.    Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

**Count V – Violations of ROSCA**

**(By Plaintiff Federal Trade Commission)**

**(IML, Chris Terry, Isis Terry)**

202.    In numerous instances, in connection with charging for an IML good or service sold in a transaction effected on the Internet through a negative option feature, the ROSCA Defendants fail to:

    a.  clearly and conspicuously disclose all material terms of the transaction before obtaining the consumer's billing information; or

    b.  obtain the consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for the transaction.

203.    These acts or practices are a violation of Section 4 of ROSCA, 15 U.S.C. § 8403, and are therefore an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE STATE OF NEVADA'S DECEPTIVE TRADE PRACTICES ACT**

204.    Plaintiff State of Nevada repeats and realleges each and every preceding allegation as if fully set forth herein.

205.    Pursuant to Nev. Rev. Stat. § 0.039, each of the Defendants is a "person" for purposes of the Nevada DTPA.

**Count VI – Violations of Nevada Revised Statute § 598.0915(5)**

**(By Plaintiff State of Nevada)**

**(Against All Defendants)**

206.    Nev. Rev. Stat. § 598.0915(5) states that a person engages in a deceptive trade practice by knowingly making a false representation as to the characteristics, ingredients, uses,

66

benefits, alterations or quantities of goods or services for sale or lease.

207.    In numerous instances in connection with the sale of Defendants' Trading Training Services, Defendants falsely represent, directly or indirectly, expressly or by implication, that purchasers will or are likely to make substantial profits by purchasing Defendants' Trading Training Services.

208.    Therefore, each of Defendants' false representations discussed in Paragraph 207 is a violation of Chapter 598 of the Nevada Revised Statutes, § 598.0915(5).

**Count VII – Violations of Nevada Revised Statute § 598.0915(5)**

**(By Plaintiff State of Nevada)**

**(Against All Defendants)**

209.    Nevada Revised Statute § 598.0915(5) states that a person engages in a deceptive trade practice by knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease.

210.    In numerous instances in connection with the sale of Defendants' Business Venture, Defendants falsely represent, directly or indirectly, expressly or by implication, that purchasers will or are likely to make substantial earnings by purchasing Defendants' Business Venture.

211.    Therefore, each of Defendants' false representations discussed in Paragraph 210 is a violation of Chapter 598 of the Nevada Revised Statutes, § 598.0915(5).

**Count VIII – Violations of Nevada Revised Statute § 598.0915(5)**

**(By Plaintiff State of Nevada)**

**(Against All Defendants)**

212.    Nev. Rev. Stat. § 598.0915(5) states that a person engages in a deceptive trade practice by knowingly making a false representation as to the characteristics, ingredients, uses,

67

benefits, alterations or quantities of goods or services for sale or lease.

213.    In numerous instances in connection with the sale of Defendants' Trading Training Services Defendants falsely represent, directly or indirectly, expressly or by implication, that:

   a.   Consumers will or are likely to earn substantial income using Defendants' services even if they have little to no experience in forex, cryptocurrency, binary options, or securities trading;

   b.   Consumers will or are likely to earn substantial income using Defendants' services even if they spend only a short amount of time each day or each week using the service;

   c.   Consumers will or are likely to earn substantial income using Defendants' services even if they do not have a substantial sum of money to invest; or

   d.   Defendants' instructors are audited by the FTC.

214.    Therefore, each of Defendants' false representations discussed in Paragraph 213 is a violation of Chapter 598 of the Nevada Revised Statutes, § 598.0915(5).

### Count IX – Violations of Nevada Revised Statute § 598.0923(1)(c)

### (By Plaintiff State of Nevada)

### (Against All Defendants)

215.    Pursuant to Nev. Rev. Stat. § 598.0923(1)(c), a person engages in a deceptive trade practice by, in the course of their business, knowingly violating a state or federal statute or regulation relating to the sale of services.

216.    As alleged herein, Defendants have violated both Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the TSR in the course of conducting business, and thus have violated Nev. Rev. Stat. § 598.0923(1)(c).

217.    Therefore, each of the Defendants' acts or practices which violate a state or federal statute or regulation relating to the sale of services is a violation of Chapter 598 of the Nevada Revised Statutes, NRS § 598.0923(1)(c).

### Count X – Violations of Nevada Revised Statute § 598.0923(1)(c)

**(By Plaintiff State of Nevada)**

**(Against Defendants IML, Chris Terry, and Isis Terry)**

218.    Pursuant to Nev. Rev. Stat. § 598.0923(1)(c), a person engages in a deceptive trade practice by, in the course of their business, knowingly violating a state or federal statute or regulation relating to the sale of services.

219.    As alleged herein, the ROSCA Defendants have violated Section 4 of ROSCA, 15 U.S.C. § 8403, and thus have violated Nev. Rev. Stat. § 598.0923(1)(c).

220.    Therefore, each of the Defendants' acts or practices which violate a state or federal statute or regulation relating to the sale of services is a violation of Chapter 598 of the Nevada Revised Statutes, NRS § 598.0923(1)(c).

### CONSUMER INJURY

221.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, ROSCA, the TSR, and the Nevada DTPA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

### THIS COURT'S POWER TO GRANT RELIEF UNDER THE NEVADA DTPA

222.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow plaintiff, the State of Nevada, to enforce its state law claims under the Nevada DTPA, against defendants in this Court. Section 598.0963(3) of the Nevada Revised Statutes, NRS § 598.0963(3), empowers this Court to grant injunctive and other equitable relief to prevent and

remedy violations of that Act.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act, ROSCA, the TSR, and the Nevada DTPA by Defendants;

B.     Grant preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, a preliminary injunction and the appointment of a monitor over Corporate Defendants;

C.     Award monetary and other relief within the Court's power to grant;

D.     Award Plaintiff State of Nevada attorneys' fees; and

E.     Award any additional relief as the Court determines to be just and proper.


Dated: May 1, 2025

Respectfully submitted,

THOMAS M. BIESTY
LAURA C. BASFORD
J. RONALD BROOKE, JR.
JOSHUA A. DOAN
Federal Trade Commission
600 Pennsylvania Ave., NW, CC-8528
Washington, D.C. 20580
(202) 326-3043 (Biesty)
(202) 326-2343 (Basford)
(202) 326-3484 (Brooke)
(202) 326-3187 (Doan)
Email: tbiesty@ftc.gov; lbasford@ftc.gov;
jbrooke@ftc.gov; jdoan@ftc.gov


Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

70

AARON D. FORD
Attorney General

ERNEST D. FIGUEROA
Consumer Advocate

LUCAS J. TUCKER
SAMANTHA B. FEELEY
Office of the Nevada Attorney General
8945 West Russell Road, Suite #204
Las Vegas, NV 89148
(702) 486-3256 (Tucker)
(702) 486-3789 (Feeley)
Email: ltucker@ag.nv.gov; sfeeley@ag.nv.gov

Attorneys for Plaintiff State of Nevada

71

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Federal Trade Commission and State of Nevada

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See Attachment A

## DEFENDANTS

See Attachment B

County of Residence of First Listed Defendant  Clark County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

See Attachment C

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

[X] 1 U.S. Government Plaintiff

[ ] 2 U.S. Government Defendant

[ ] 3 Federal Question *(U.S. Government Not a Party)*

[ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT

- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY

- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS

- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

### PRISONER PETITIONS

**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY

- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

### LABOR

- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### IMMIGRATION

- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

### BANKRUPTCY

- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS

- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY

- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS

- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES

- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [X] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

[X] 1 Original Proceeding

[ ] 2 Removed from State Court

[ ] 3 Remanded from Appellate Court

[ ] 4 Reinstated or Reopened

[ ] 5 Transferred from Another District *(specify)*

[ ] 6 Multidistrict Litigation - Transfer

[ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 45(a), 53(b), and 57b; 15 U.S.C. §§ 8403 and 8404; 15 U.S.C. §§ 6101-6108; 16 C.F.R. Part 310

Brief description of cause:
Deceptive sales of trading training services and business venture violating the FTC Act, the Telemarketing Sales Rule, ROSCA, and Nev. Rev. Stat.

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: [ ] Yes [X] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE  May 1, 2025

SIGNATURE OF ATTORNEY OF RECORD   *Thomas M. Biesty*

### FOR OFFICE USE ONLY

RECEIPT #        AMOUNT        APPLYING IFP        JUDGE        MAG. JUDGE

## <u>ATTACHMENT A – PLAINTIFFS' COUNSEL</u>

1.  Thomas M. Biesty
    Laura C. Basford
    J. Ronald Brooke, Jr.
    Joshua A. Doan
    Federal Trade Commission
    600 Pennsylvania Ave., NW, CC-6316
    Washington, DC 20580
    (202) 326-3043 (Biesty)
    (202) 326-2343 (Basford)
    (202) 326-3484 (Brooke)
    (202) 326-3187 (Doan)

2.  Lucas J. Tucker
    Samantha B. Feeley
    State of Nevada, Office of the Attorney General
    Bureau of Consumer Protection
    8945 W. Russell Road, #204
    Las Vegas, NV 89148
    (702) 486-3256 (Tucker)
    (702) 486-3789 (Feeley)

## <u>ATTACHMENT B – DEFENDANTS</u>

1. INTERNATIONAL MARKETS LIVE, INC., a corporation, also d/b/a IYOVIA, iMarketsLive, IM Mastery Academy, and IM Academy;

2. IM MASTERY ACADEMY LTD., f/k/a International Markets Live Ltd., a United Kingdom company;

3. ASSIDUOUS, INC., a corporation;

4. GLOBAL DYNASTY NETWORK, LLC., a limited liability company;

5. CHRISTOPHER TERRY, individually and as an owner and officer of INTERNATIONAL MARKETS LIVE, INC.;

6. ISIS TERRY, f/k/a ISIS DE LA TORRE, individually and as an owner and officer of INTERNATIONAL MARKETS LIVE, INC., IM MASTERY ACADEMY LTD., and ASSIDUOUS, INC.;

7. JASON BROWN, individually and as an officer of INTERNATIONAL MARKETS LIVE, INC. and as a member of GLOBAL DYNASTY NETWORK, LLC;

8. ALEX MORTON, individually and as an officer of INTERNATIONAL MARKETS LIVE, INC.;

9. MATTHEW ROSA, individually and as a member of GLOBAL DYNASTY NETWORK, LLC; and

10. BRANDON BOYD.

## ATTACHMENT C – DEFENDANTS' COUNSEL

1. Lars Evensen
   Holland & Hart LLP
   955 Hillwood Drive, 2nd Floor
   Las Vegas, NV 89134
   (702) 669-4631
   lkevensen@hollandhart.com
   *International Markets Live, Inc.*
   *IM Mastery Academy Ltd.*
   *Assiduous, Inc.*
   *Christopher Terry*
   *Isis Terry*

2. Robby H. Birnbaum
   Greenspoon Marder, LLP
   100 West Cypress Creek Road, Suite 700
   Fort Lauderdale, FL 33309
   (954) 343-6959
   robby.birnbaum@gmlaw.com
   *Global Dynasty Network, LLC*
   *Jason Brown*
   *Matthew Rosa*

3. Jeffrey Shields
   Ray Quinney & Nebeker P.C.
   36 South State Street, Suite 1400
   Salt Lake City, UT 84111
   (801) 323-3374
   jshields@rqn.com
   *Brandon Boyd*

4. Nick Oberheiden
   Oberheiden P.C.
   (888) 680-1745
   nick@federal-lawyer.com
   *Alex Morton*